IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-02142-RBJ

MICHAEL J. PAQUIN, an individual,

    Plaintiff,

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
a New Jersey for-profit corporation,

    Defendant.

---

ORDER

---

This case, which arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., is a review of defendant Prudential Insurance Company of America's termination of plaintiff Michael J. Paquin's long-term disability benefits. After considering the arguments, applicable law, and administrative record, the Court reverses the termination of Mr. Paquin's benefits for the reasons stated herein, and therefore GRANTS Mr. Paquin's motion for summary judgment, ECF No. 48.

## I. BACKGROUND

**A. Factual and Procedural Background.**

In 2003 Michael Paquin contracted encephalitis from a mosquito infected by the West Nile virus. He sustained brain damage and cognitive difficulties that interfered with his ability to continue his employment as a Business Development Director for Transistor

Devices, Inc. ("TDI"). TDI offered an employee benefits plan which was insured and administrated by Prudential Insurance Company of America. The plan states, in relevant part:

> You are disabled when Prudential determines that:
> - you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience . . .
>
> Material and substantial duties means duties that:
> - are normally required for the performance of your regular occupation; and
> - cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.
> - gainful occupation means an occupation, including self-employment, that is or can be expected to provide you with an income equal to at least 60% of your indexed monthly earnings within 12 months of your return to work.

R. 2163.

Initially Prudential approved Mr. Paquin for short-term disability benefits in 2003. In 2004 Mr. Paquin's employment ended, and he applied for long-term disability ("LTD") benefits under the company's employee benefits plan. Prudential approved his application and provided him LTD benefits beginning in April 2004. R. 1803. However, when Mr. Paquin attempted (unsuccessfully) to go back to work for a trial period, Prudential terminated Mr. Paquin's LTD benefits in May 2004. Mr. Paquin appealed this decision, and after reviewing his file Prudential reversed its determination in 2006, reinstated Mr. Paquin's benefits, and paid back Mr. Paquin's benefits from May 2004 through January

2006.

From January 2006 until January 7, 2015—roughly eleven years—Prudential paid Mr. Paquin LTD benefits. It regularly reviewed Mr. Paquin's file throughout the years, and each time it determined that Mr. Paquin's disability warranted LTD benefits.

However, on January 8, 2015 Prudential terminated Mr. Paquin's LTD benefits, due in large part to one independent neuropsychological test ("NPT") and Prudential's conclusion that there was no valid evidence of a continuing impairment that would prevent Mr. Paquin from performing the duties of his regular occupation. Two internal appeals of that decision were unsuccessful. On August 24, 2016 Mr. Paquin filed this suit challenging the denial of his LTD benefits under the Employee Retirement Income Security Act of 1974, or ERISA. Now before the Court is Mr. Paquin's motion for summary judgment. ECF No. 48. The motion has been fully briefed and is ripe for this Court's review.

**B. Medical Evidence in the Administrative Record.**

The following is a summary of the medical evidence that was before Prudential when it decided to terminate Mr. Paquin's LTD benefits and when it denied Mr. Paquin's subsequent appeals.

- September 2003: Neurologist Janice Miller, MD, treats Mr. Paquin for viral encephalitis and meningitis after exposure to West Nile virus. During this hospital stay, Mr. Paquin is also seen by infectious disease physician Nelson Ganz, MD. R. 22, 117.

- November 2003: Upon referral by Dr. Miller, Mr. Paquin visits Mapletown Rehabilitation Center for cognitive therapy and evaluation. Medical records from these visits indicate notable cognitive impairments. R. 12, 29–65.

- November 21, 2003: Speech language pathologist Melissa Hundley, MS, evaluates Mr. Paquin for neurotrauma speech and language therapy, and she notes that he has "a variety of cognitive deficits which include: decreased short term recall, impaired

3

word finding, impaired processing, impaired executive functioning and an inability to complete multiple tasks." R. 36.

- February 2003: Treating neurologist Michelle Ferguson, MD, certifies Mr. Paquin's West Nile virus exposure as encephalitis. R. 12.

- June 2004: Dr. Ferguson again notes "[p]ersistent and worsening cognitive problems after West Nile encephalitis last year." R. 87.

- May 2004: Marilyn Newsome, MD, PhD, evaluates and treats Mr. Paquin for sleep disorder potentially resulting from West Nile virus. R. 11.

- May 10, 2004: Prudential terminates Mr. Paquin's LTD benefits after Mr. Paquin returns to work for a trial period of 18 hours a week. Prudential upholds its termination in February 2005. R. 210, 1817.

- August 18, 2005: Mr. Paquin submits a formal administrative appeal of the LTD denial. Included in this submittal are the following reports supporting his claim:
    - Report of Julie Stapleton, MD. R. 608–10.
    - Report of Nelson Ganz, MD. R. 613–15.
    - NPT evaluation conducted by neuropsychologist Jan Lemmon, PhD, where Dr. Lemmon concluded that Mr. Paquin showed such cognitive impairment that he could not work. R. 158–59, 587–95.
    - Brain SPECT scan imaging studies conducted and interpreted by clinical neuroscientist S. Gregory Hipskind, MD, PhD of Brain Matters. R. 93, 510.
    - Records from physicians Newsome, Ferguson, Politzer, and from Boulder Community Hospital and Mapleton Rehabilitation Center. R. 29–65, 489.
    - Mr. Paquin's former employer, TDI's, employment termination documents reflecting its belief that Mr. Paquin's "capabilities had been (were) seriously affected by his illness, and he was incapable of performing his job assignments to TDI standards." R. 71, 490.
    - Vocational assessment by vocational rehabilitation expert Mark Litvin, PhD. R. 152–87.

- November 14, 2005: Prudential obtains its own NPT conducted by neuropsychologist Donald Taylor, PhD, who found that Mr. Paquin had impaired cognition and executive dysfunction. Dr. Taylor noted that Mr. Paquin's performance "did not consistently give evidence of impairment" but ruled out any "magnification of cognitive symptoms" or "disingenuous effort." Dr. Taylor concluded that "Mr. Paquin's cognitive deficits appear to stem from his West Nile virus infection and the impact of West Nile-related chronic fatigue and chronic sleep

4

deprivation on his cognitive functioning."  R. 938, 954–55.

- January 17, 2006: Prudential reverses its termination of Mr. Paquin's LTD benefits and pays back benefits to the date on which it terminated Mr. Paquin's benefits.  R. 1849–50.

- February 2006: Prudential internally reviews Mr. Paquin's claim and notes that "ap does not predict a rtw date. Per medical on file, medical supports td a/o" which Mr. Paquin argues means "attending physician does not predict a return to work date. Per medical on file, medical supports total disability any occupation."  R. 1955.

- April 2006: Prudential determines that Mr. Paquin is disabled from any gainful occupation, recognizing Mr. Paquin's cognitive defects.  R. 1955.

- October 2008: Prudential reviews Mr. Paquin's claim and again concludes that he is totally disabled with regard to any gainful occupation.  The review included Dr. Julie Stapleton's conclusion that Mr. Paquin was "chronically and permanently disabled, that he had decreased cognitive stamina, decreased memory and has inattention."  Prudential's file also noted that Mr. Paquin's "cognitive impairment has not improved since [] almost 3 yrs ago, and would most likely be permanent…lack of cognitive abilities, slow thought processes and inability to multitask would prevent return to sustained employment."  R. 2026.

- October 2010: Prudential reviews Mr. Paquin's claim and affirms LTD benefits.  It notes that management determined it was to continue providing Mr. Paquin benefits for "max duration" with a follow-up in 3 years.  Under Mr. Paquin's plan, "max duration" means until age 66, which here would be 2026.  R. 1957.

- October 2013: Prudential reviews Mr. Paquin's claim.  It receives treatment records from Dr. Stapleton and from Mr. Paquin's primary care treating internist, David Nuhfer, MD.  Both doctors supplied four reports, and these reports concluded that Mr. Paquin had chronic neurological problems resulting from his West Nile virus.  R. 1257–79, 1254–64.

- 2013 and 2014: Prudential conducts an internal audit of Mr. Paquin's claim and finds that Mr. Paquin is permanently disabled.  This audit included the review and opinions by claim managers, a registered nurse, and vocational rehabilitation specialists.  Claim Manager Mary Stratton noted in Mr. Paquin's file that his cognitive issues were not likely to improve and that there are no gainful employment options for Mr. Paquin based on the evidence in the record.  R. 1963

- August 14, 2014: Mr. Paquin's file includes an entry regarding a "settlement calculation" concluding that Prudential has "total possible liability $641,668."  This

5

indicates that Prudential was at least considering the possibility of paying Mr. Paquin a lump sum payment for the duration of his disability period (until 2026). R. 1963.

- September 10, 2014: Prudential orders Mr. Paquin to undergo another NPT test with a neuropsychologist hired by Prudential via a third-party company. Dr. Julie Rippeth, PhD, reviews Mr. Paquin's records, examines him personally, and performs battery exams.

- January 7, 2015: In a 39-page report, Dr. Rippeth concludes that there is no evidence to support Mr. Paquin's limitations or medically necessary work restrictions. Instead, she believed that Mr. Paquin "did not consistently perform to his true capability over the course of the cognitive test battery." She therefore found that "Mr. Paquin's test results do not have sufficient validity overall to ensure that they are an adequate representation of his current level of cognitive functioning, and their interpretation is significantly limited." Therefore, in discounting much of the record as unreliable, she assessed the records she found reliable and found that there was no valid or compelling evidence to support clinically significant cognitive impairments. R. 667.

- January 8, 2015: Prudential terminates Mr. Paquin's LTD benefits. In its termination it stated: "Based on this recent NPT [Dr. Rippeth's NPT], the clmt does not have any r[estriction]s and l[imitation]s from a cognitive or psychiatric perspective and so no further LTD benefits are payable. Terminating benefits at this time and closing claim." R. 1966.

- July 6, 2015: Mr. Paquin appeals the termination of his benefits. Included in this appeal are the following documents in support:
    - The 2005 appeal documents.
    - Dr. Stapleton's June 12, 2015 disability examination where she again found that Mr. Paquin is disabled and unable to return to employment. R. 698.
    - A letter from neuropsychologist Mark Zacharewicz, PhD, who treated Mr. Paquin in 2006. He stated that he disagreed with Dr. Rippeth's findings and disputed her methodology and interpretation. To demonstrate why he believed Prudential's use of NPT was improper, he discussed of the proper use of NPT when validity measures are triggered. R. 1437–42.
    - A letter from non-treating psychiatry professor Steven Dubrovsky, MD, criticizing Prudential's decision making as it deviated from acceptable medical standards. He noted that "Prudential's reliance on Dr. Rippeth's single invalid test without considering 10 years of consistent clinical and neuropsychological findings or even a consideration of factors that might have affected the results is not a

>   valid basis for a decision to terminate benefits." R. 1250.
>     - A letter from non-treating neurology professor Kenneth Tyler, MD, explaining the NPT testing often fails to capture the extent of West Nile virus patients' neurological impairments. R. 765–66.

- October and November 2015: Prudential hires two doctors to review Mr. Paquin's file, Michael Villanueva, PsyD, and Howard Grattan, MD. Prudential had hired these individuals to review Prudential claims many times before—Dr. Villanueva reviewed files for Prudential at least 105 times in 2014–2015 and was paid at least $7,368 to review Mr. Paquin's file; Dr. Grattan reviewed files for Prudential at least 54 times in those same years and was paid $3,500 to review Mr. Paquin's file.. R. 1700, 1796, 1717. After reviewing the medical records—including a 2008 NPT assessment performed by Dr. Lemmon which Prudential says it had not been provided with prior—Dr. Villanueva found that Mr. Paquin did not have any psychological or cognitive impairments, and Dr. Grattan found "no evidence of any neuromuscular deficits resulting in a physical impairment." R 1714.

- November 6, 2015: Prudential upholds the termination of Mr. Paquin's LTD benefits. R. 1923–29.

- May 5, 2016: Mr. Paquin again appeals the termination, providing additional evidence. The new evidence is:
    - A letter from Dr. Lemmon, PhD, dated December 19, 2015, who disputes Prudential's use of Dr. Rippeth's report as grounds for termination. She notes that she is troubled by NPT reports being used to test for West Nile virus deficits. R. 1730.
    - A functional capacity evaluation (FCE) completed over three days by Sherri Young, OTR. She concludes that Mr. Paquin's memory problems preclude him from work in positions where he could earn a comparable income to that which he was making before his disability. While she found that his overall cognitive test scores fell within normal range, these scores were not high enough for Mr. Paquin to perform the cognitive functions of his regular occupation. R. 1743–82.

- June 8, 2016: Prudential again upheld its determination after asking Drs. Villanueva and Grattan to review the new information submitted by Mr. Paquin. The doctors concluded that the new information did not alter their prior opinions. R. 1786, 1790.

## II. STANDARD OF REVIEW

Parties may present a dispositive motion in an ERISA case such as this one either as a

7

motion for a bench trial on the papers or as a motion for summary judgment. *See Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1307 n.1 (10th Cir. 2007), *cert denied*, 553 U.S. 1079 (2008). Here, Mr. Paquin filed a motion for summary judgment, but the usual posture of Federal Rule of Civil Procedure 56 does not apply. Rather, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation marks omitted).

When an employee benefits plan governed by ERISA gives the administrator discretionary authority to determine eligibility for benefits, a district court reviews denials using an abuse of discretion standard.[1] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under this standard, the court considers whether the denial of a claim for benefits was arbitrary and capricious. *Murphy v. Deloitte & Touche Group Ins.*, 619 F.3d 1151, 1157 (10th Cir. 2010). The court will assess whether the administrator's decision was reasonable and made in good faith. *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004). An administrator's decision is reasonable if the administrator based the decision on substantial evidence in the administrative record before it, *i.e.*, that evidence which a reasonable mind might accept as adequate to support the conclusion reached. *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992) (noting that substantial evidence is "more than a scintilla but less than a preponderance" of evidence).

---

[1] In an order dated July 10, 2017 I determined that the proper standard of review in this case is the abuse of discretion standard. ECF No. 18 at 2–4.

Because ERISA relies on trust law principles, several factors must be considered in reviewing an insurer's denial of benefits. While no one factor is dispositive, "any one factor will act a 'tiebreaker' when the other factors are closely balanced," *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 106 (2008). These factors include any procedural irregularities, such as where the insurer "cherry picked" the file for evidence to support a denial. *Smith v. Reliance Standard Ins. Co.*, 322 F. Supp. 2d 1168, 1177 (D. Colo. 2004). In cases like this one, where Prudential both funds the Plan and adjudicates benefits claims, courts should weigh the potential conflict of interest "as a factor in determining if there is an abuse of discretion." *Glenn*, 554 U.S. at 114.

An administrator is not precluded from denying a claimant benefits by virtue of the fact that it previously paid benefits if the administrator becomes aware of new information about the claimant's eligibility. *Williams v. Metro. Life Ins. Co.*, 459 F. App'x 719, 731 (10th Cir. 2012). However, "unless information available to an insurer alters *in some significant way*, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *Id.* (*quoting Kecso v. Meredith Corp.*, 480 F.3d 849, 854 (8th Cir. 2007) (emphasis added).

### III. ANALYSIS

Mr. Paquin argues that in terminating his LTD benefits, Prudential ignored the clear weight of the evidence regarding his disability. Prudential argues that the decision was reasonable and supported by substantial evidence because it was based on the opinions of an independent examining neuropsychologist and two other independent professionals who reviewed his records. ECF No. 51 at 9.

9

As laid out above, I find that the evidence in the administrative record overwhelmingly supports the conclusion that Mr. Paquin's cognitive ailments caused by West Nile virus are permanent and disabling under the terms of the insurance policy. The evidentiary scoreboard, if you will, reads as follows: 16 healthcare professionals (all doctors of medicine or neuropsychology, aside from one occupational therapist and one speech-language pathologist, and including one doctor who was hired by Prudential) support a finding that Mr. Paquin is disabled; three doctors hired by Prudential found that Mr. Paquin is not disabled under the terms of the policy.[2] In addition, per ERISA case law the Court views the fact that Prudential paid Mr. Paquin LTD benefits for 11 years while conducting regular reviews as favorable to Mr. Paquin's claim. As recently as February 2014 Prudential Claim Manager Mary Stratton noted in Mr. Paquin's file that his cognitive issues were not likely to improve, and that there were no gainful employment options for Mr. Paquin based on the evidence in Prudential's record.

As such, the only way that Prudential can succeed under the applicable standard of review is if it can show that new, material medical evidence indicates that Mr. Paquin is no longer disabled under the terms of the Policy. I find that this has not been shown. Prudential relies on three medical opinions—those of Drs. Rippeth, Villanueva, and Grattan. However, Drs. Villanueva and Grattan only became involved in this case *after* Prudential decided to terminate Mr. Paquin's LTD benefits. The only "new" piece of evidence that Prudential relied on to make its initial decision to terminate benefits was Dr. Rippeth's opinion from

---

[2] Medical records provided by the following medical professionals support Mr. Paquin: Dr. Miller; Speech-language pathologist Hundley; Dr. Ferguson; Dr. Stapleton; Dr. Ganz; Dr. Lemmon; Dr. Newsome; Dr. Hopskind; Dr. Politzer; Dr. Zacharewicz; Dr. Litvin; Dr. Taylor; Dr. Nuhfer; Dr. Dubrovsky; Dr. Tyler; and Occupational Therapist Young.

January 2015. Dr. Rippeth apparently suspected, based upon her interpretation of neuropsychological test results, that Mr. Paquin intentionally underplayed his abilities, and that many of his prior records were therefore unreliable. Having thus dismissed or devalued test results that she found unreliable, she determined that Mr. Paquin's cognitive abilities fell within the normal range and rendered him able to work. I am not persuaded.

In the first place, none of the other professionals who had evaluated and treated Mr. Paquin during the previous 11 years had thought that Mr. Paquin was malingering in any way. Moreover, in appealing the termination of his benefits, Mr. Paquin provided letters from three reputable doctors who reviewed Dr. Rippeth's opinion and found her rationale to be flawed if not outright incorrect. Dr. Rippeth determined that Mr. Paquin was not disabled based in large part upon NPT evaluation results, but these three doctors noted that NPTs often fail to capture the true extent of West Nile virus patients' cognitive difficulties and are therefore inappropriate grounds in and of themselves by which to establish Mr. Paquin's abilities.

The record was supplemented by the opinions of another neuropsychologist and a medical doctor who apparently agree with Dr. Rippeth. I have noted that those doctors have some history of working with Prudential. That history does not establish that they did anything other than calling it as they saw it.[3] Nevertheless, I find that their opinions are too little, too late, and too contrary to the weight of medical opinion and the history of this case to support a drastic revision of the disability determination. I also note, again, that three

---

[3] *But see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (crediting the "concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements").

11

doctors who have examined their opinions disagree with them.

Prudential also argues that its decision to terminate benefits is supported by a 2008 NPT performed by Dr. Lemmon to which it only had access in 2015. Drs. Villanueva and Grattan reviewed this NPT and found that it supported Dr. Rippeth's finding. As a preliminary note, it appears that Prudential was made aware of the 2008 NPT earlier than it alleges. *See* R. 1276. However, putting the timing issue aside, I do not find this NPT to be the 'significant' evidentiary bombshell Prudential alleges it to be. ECF No. 51 at 6. Even after Dr. Lemmon performed the 2008 NPT in question, she maintained her belief that Mr. Paquin is disabled. Indeed, in 2015 Dr. Lemmon wrote that Mr. Paquin "is not able to consistently muster and sustain mental effort to successfully maintain gainful employment." R. 1730. As such, this NPT cannot explain why Prudential suddenly changed course in recognizing the extent of Mr. Paquin's disability.

"[A]n administrator's decision is reasonable if the administrator based the decision on substantial evidence in the administrative record before it, *i.e.*, that which a reasonable mind might accept as adequate to support the conclusion reached." *Sandoval*, 967 F.2d at 381. I do not find that an objectively reasonable mind would find that the Rippeth opinion, supplemented later by the opinions of Drs. Villanueva and Grattan, and the 2008 NPT, in the context of the record taken as a whole, support the termination decision. Prudential appears to have reviewed that evidence with blinders on. The Court will not do so.

In sum, I conclude that Prudential's termination decision, in light of the vastly stronger body of evidence to the contrary, was an abuse of discretion. In reaching that conclusion, I weigh, as the law permits, Prudential's potential conflict of interest as a factor.

*See Glenn*, 554 U.S. at 114.

## IV. ORDER

For the reasons set forth above, the Court ORDERS as follows:

1. Mr. Paquin's Motion for Summary Judgment (ECF No. 48) is GRANTED.

2. The Clerk of Court shall enter judgment in Mr. Paquin's favor. Mr. Paquin is entitled to an award of past LTD benefits from the date of termination (January 8, 2015) through the date of judgment, with interest. Further, Mr. Paquin's LTD benefits shall be reinstated as of the date of judgment and going forward.

3. Mr. Paquin may file an appropriate motion for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

DATED this 26th day of July, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge